

Mel Marin                              8/20/2013
P.O. Box 1654
Hermitage,  PA 16148

Plaintiff
*Pro Se*

## CIV13-1094  TUC DTF

# IN  THE  UNITED  STATES  DISTRICT  COURT

# FOR  THE  DISTRICT  OF  ARIZONA

| | | |
|---|---|---|
| MEL  MARIN, | ) | Civil  _____ |
| | ) | |
|        Plaintiff, | ) | **COMPLAINT** |
| | ) | **FOR** |
| v. | ) | **LEGAL   MALPRACTICE** |
| | ) | **AND** |
| TILTON  &  SOLOT, | ) | **BREACH  OF  FIDUCIARY** |
| Law Office | ) | **DUTY  BY  FRAUD** |
| (Unincorporated  Association) | ) | **AND** |
| 459 N. Granada  Ave. | ) | **WRONGFUL   DEATH** |
| Tucson, AZ   85701 | ) | |
| and | ) | |
| THOMAS T. TILTON, | ) | |
| and | ) | |
| ALAN  SOLOT, | ) | |
| INDIVIDUALLY, | ) | |
| JOINTLY  AND  SEVERALLY, | ) | |
| | ) | |
|        Defendants, | ) | JURY   DEMANDED |

Plaintiff alleges as follows:

## JURISDICTION  AND  VENUE

1.   This court has jurisdiction pursuant to 28 U.S.C. Section 1332 because the defendants are domiciled in Pima County, and plaintiff ("son") is domiciled in Pennsylvania and the claim exceeds one million dollars.

2.   Plaintiff's father deceased on November 3, 2008, and plaintiff is his administrator, trustee of father's trusts, and beneficiary, and assignee of all of father's claims under a valid testamentary trust.  That made son as of January 2010 when father's bankruptcies ended, the absolute owner of all of the claims of father and of father's trusts and of the family trusts.

3.   Defendants were retained as attorneys for plaintiff's father, Milivoj Marinkovic, in the bankruptcy actions In re Marinkovic, 02-378 (Bankr. D. Ariz.), and In re Marinkovic, 02-029 (Bankr. D. Ariz.), and committed malpractice by negligence and breached their fiduciary duty by fraud, but remained attorneys of record for father until the dismissal of father's  bankruptcy in 2009, and the end of all appeals therefrom in January 2010.

4.   Specifically, during the main bankruptcy action 02-378, Attorney SOLOT on behalf of TILTON and their law firm, started a related adversary action called Marinkovic v. Midland Loan, 02-00029 (Bankr. D. Ariz.), seeking a ruling by the bankruptcy judge that a prior foreclosure sale by the mortgage

holder Midland on January 25, 2002 was void, because the sale was taken before

a previous bankruptcy was closed, under the rule from the court of appeals which

governs the Arizona bankruptcy courts: In re Schwartz, 954 F.2d 569, 571 [2] (9th

Cir. 1992)(sale of property while a bankruptcy is still open is void).

    5.   Because of this rule, the prior foreclosure sale of the Arizona

apartments worth over $400,000 would have been declared void and father's

property would have been saved and protected in the main bankruptcy where his

attorney would have filed a plan to show father and son were not in default on

any payments, and allow the continuation of the real estate business with the

income from those Arizona units at 240 W. Sahuaro St., In Pima County.   This is

because the prior foreclosure sale on January 25, 2002 had taken place before the

prior bankruptcy judge entered a dismissal order, making the foreclosure sale

void because the automatic bankruptcy stay was still in place when the bank took

the apartments for themselves, under In re Arrowhead Estates Development Co.,

42 F.3d 1306, 1311 [3](9th Cir. 1994) (notice of appeal was timely where it was

filed months after an oral order, since oral order is not final), and In re  Taylor,

884 F.2d 478, 481 n. 4 (9th Cir.  1989)("It is clear that under the Bankruptcy

Rules, that a judgment or final order is not effective until entered in the

bankruptcy court docket. Bankr.R. 9021, 5003."), and In re Schmmels, 85 F.3d

416, 420 (9th Cir. 1996) (bankruptcy court judgment is not final until entry).

6. Defendants also had a contract with the family trust for which son was the trustee at the same time, as a third-party beneficiary of the representation of father under the rule in <u>Paradigm Ins. Co. v. Langerman Law Offices, P.A.</u>, 196 Ariz. 573, 2 P.3d 663, 669-70 [¶ 24](Ariz. Ct. App. 1999) (jury may determine that attorney-client relationship existed simply by the lawyer giving advice even without written contract), <u>Petrine v. Sinchak-Higby</u>, 2009 Ariz. App. Unpub. LEXIS 970 at ¶ 13 (June 2, 2009), <u>Capitol Indem Corp. v. Fleming</u>, 203 Ariz. 589, 58 P.3d 965, 967 [3] ¶¶ 6, 7 (2002)(when a lawyer undertakes to represent the guardian, he also undertakes representation of the ward, where benefit to one is intended by the other), and <u>Wetherill v. Basham</u>, 197 Ariz. 198, 207 [14], ¶36, 3 P.3d 1118 (App. 2000) (lawyer *could* owe duty to both a client and a non-client in a trust situation, if intent to benefit non-client were present).

7. That representation period tolled all statutes of limitation on claims against the lawyer in that action until the end of all appeals in January 2010 under <u>Missouri v. Jenkins</u>, 495 U.S. 33, 45, 110 S.Ct. 1651, 1660, 109 L.Ed.2d 31 (1990), <u>Berroteran-Melendez v. Immigration and Naturalization Service</u>, 955 F.2d 1251, 1254 (9th Cir. 1992)(tolled until last appeal is final), and <u>Cecala v. Newman</u>, No. CV -04- 02612, 2007 U.S. Dist. LEXIS 32851 at * 45 (Dist. Ariz. May 2, 2007)(time starts running after final denial by highest appeals court).

8. The appeal also tolled all limitations periods because it could have

prevented the injury created by the defendants, under the rule in <u>Mackenzie v.</u>
<u>Leonard</u>, cv-08- 1737,  2010 U.S.Dist. LEXIS 200 at * 11  (D. Ariz. Jan. 4,
2010)(if a prior appeal could have prevented the loss alleged, there is no injury
and the limitations  period does not start to run until after that appeal ends without
success).

9.    Additionally, father and son actually tried to prosecute claims of father
and son against lawyers and cities for fraud and evictions before the end of that
bankruptcy appeal process, and were stopped and told they had to wait until the
bankruptcy was fully ended, in <u>Marinkovic v. Sparks</u>,  C2002-5182 (Super Ct.
Pima May 30, 2003) and <u>Marin v. Utica</u>, 140 F. App'x 304 (2nd Cir. 2005).

10.   That gave son two years from January 2010 to move against these
defendants for negligence and three years under breach of fiduciary duty based on
fraud, because the statute of limitations for attorney negligence is two years,
under Arizona Revised Statutes § 12-542, and three years for breach of fiduciary
duty based on fraud under A.R.S. § 12- 543 (3).

11.   But son stopped the running of that time by submitting this same
complaint in the Superior Court of Pima County, with a request for fee waiver or
deferment first in 2009, then when it was lost by that court again in October 25,
2010,  under the rule in <u>Lacina v. G.K.  Trucking</u>, 877 F.2d 741, 742 (9th Cir.
1989) (limitations period stops on tender of complaint even if not in compliance

with local rules), <u>McCrum v. Elkhart County Dept. of Public Welfare</u>, 806

F.Supp. 203 (N.D.Ind. 1992)(request for *pauperis* and submission of complaint

stops limitations periods),

12.   The court clerk then refused to file the complaint because the clerk

required son to fabricate income that did not exist, and put into the boxes that the

clerk wanted.   Despite several attempts by son and mail exchanges with court

staff and judges over a several year period, the clerk persisted in refusing.

13.   Plaintiff-son then appealed that refusals of the clerk to grant fee

waiver  or deferment under the rule in <u>Friends of the Coast Fork v. US Dept. of</u>

<u>the Interior</u>, 110 F.3d 53 (9th Cir. 1997)(granting of only partial fee waiver is

immediately appealable as a denial of IFP),  <u>Roberts v. United States District</u>

<u>Court  for The Northern District of California</u>, 339 U.S. 844, 70 S.Ct. 954, 955

[3](1950) (denial of IFP status is jurisdictional and is an immediately appealable

order), and  <u>Zaroff v. Holmes</u>, 379 F.2d 875, 877 (D.C. Cir. 1967)(dismissal for

14.   The Arizona Supreme Court declined a review in July 2013, and that

time in that appeal also stopped all limitations periods under the rule in <u>Missouri</u>

<u>v. Jenkins</u>, 495 U.S. 33, 45, 110 S.Ct. 1651, 1660, 109 L.Ed.2d 31 (1990),

<u>Berroteran-Melendez  v. Immigration and Naturalization Service</u>, 955 F.2d 1251,

1254 (9th Cir. 1992)(tolled until last appeal is final), <u>Berg v. Leason</u>, 793 F.Supp.

903 (N.D.Cal. 1992), <u>reversed</u>, 32 F.3d 422, and <u>Attwood v. Mendicino Coast</u>

<u>Dist Hosp.</u>, 886 F.2d 241 (9th Cir. 1989) (equitable tolling is available based on a prior state proceeding dismissed without reaching the merits).

15.   The deadline within which to file this action, therefore, is still one full year away on the negligence claims and two full years away on the fraud and wrongful death claims, making this action timely.   That makes this action well within all limitations periods.

## FIRST   CAUSE   OF   ACTION
## FOR   MALPRACTICE   ( NEGLIGENCE )

16.   All prior allegations are incorporated herein by this reference.

17.   The elements a plaintiff must allege and prove for an attorney malpractice claim based on negligence are (a) existence of a duty, (b) breach of that duty, (c) negligence by the attorney that was an actual and proximate cause of injury, and (d) the extent of the injury, under <u>Phillips v. Clancy</u>, 152 Ariz. 415, 418, 733 P.2d 300, 303 (Ct. App. 1986).

18.   As father's attorneys, these defendants had a duty to father, his trust and, therefore, son, to make correct and timely submissions to the Arizona Bankruptcy Court to protect father and his property and the property of his estate and to respond in time to adverse motions of the foreclosing bank or other

persons seeking to take that property or hurt the rights of father.

19.    These defendants breached that duty by failing to respond in time to a

motion of the foreclosing bank for summary judgment in favor of the bank, which

the bank made on June 24, 2002, thereby waiving all of father's rights to the

same property forever.

20.    In the core hearing for that motion on August 2, 2002 the judge gave

Attorney SOLOT a chance to explain why he did not file any opposition to the

bank's motion in favor of the bank, and SOLOT simply said he could "file it

now" if the court allows, and the judge in his judgment in favor of the bank stated

expressly or by implication that father's attorney had a duty to file an opposition

and failed and, therefore, father lost because of his attorney.

21.    That conduct of Attorney SOLOT and his law firm constituted

negligence, and that negligence was the actual, sole, proximate, and legal reason

for the ruling in favor of the bank and against father and by implication against his

estate and his son.

22.    However, even if this jury finds that negligence was *not* the only

reason for the judgment in favor of the bank on August 2, 2002, it can still decide

that out of all the other possible causes, that reason was a "substantial factor" in

the judgment for the bank and, therefore, can still be one of the actual, proximate

and legal causes for the judgment in favor of the bank on August 2, 2002 causing

the loss of the apartments, because of the rule in <u>Milliken v. Bradley</u>, 418 U.S.

717,  745, 94 Supreme Court 3112, 41 L. Ed. 2d 1069  (1974)(there could have

been several reasons for the loss claimed  here, and several people may have each

contributed substantially to cause the harm and, therefore, all of them could be a

legal  or proximate or substantial cause of the loss if this jury says so), and <u>Scirex</u>

<u>Corp. v. Federal Ins. Co.</u>, 313 F.3d 841,  849-50 (United States Court of Appeals

for the 3d Circuit 2002)(the direct cause of a loss "does not have to be the sole

cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be

a proximate or substantial cause" of the loss to allow a damages award).

23.   These defendants also breached that duty of care toward their clients

by failing to oppose the motion of a California lawyer, Michael Richter, who

appeared in the Arizona bankruptcy action in April and May and June and July

2002 and falsely represented that he was the attorney for mother, Eva

Marinkovic, which allowed that California attorney to waive all of mother's rights

to the same apartments in exchange for payment of about $90,000 to that

California lawyer; none of which went to mother because Richter was not her

lawyer.

24.   That failure to oppose the action as to Richter's claims hurt father

and his estate because it destroyed one-half of father's claim to his own

apartments immediately, and cleared the way for father's early forced eviction,

and eventual death earlier than they would have happened otherwise.

25.    The extent of the injuries to father, son and family trust are as follows:

a.    Father lost the entire $400,000 apartments.

b.    Son lost his $300,000 trustee's lien on them.

c.    Father and son and family trust lost the family home in California worth $1 million because of inability to pay the mortgage which the apartments paid for.

d.    Father and son and family trust lost the projects and properties in Pennsylvania and New York worth another $100,000.

e.    Son lost his active duty military career and his civilian career and a normal social life for two decades valued at $1 million, by having to concentrate all of his efforts on the bankruptcies to recover the property and generate the income for father's (and mother's) health care costs.

f.    The family medical research with alternative medicine was forced to stop  completely, putting father and mother at health risk immediately.

g.    Father died early as a result of the lack of income to continue that medical work.

26.    WHEREFORE, plaintiff seeks and is entitled to $ 2.8 million from defendant in actual costs, and another $15 million in punitive damages.

## SECOND CAUSE OF ACTION

## FOR BREACH OF FIDUCIARY DUTY BY FRAUD

27.   All prior allegations are incorporated herein by this reference.

28.   When son asked SOLOT why he did not file a timely opposition to the motion of the bank for judgment on the apartments, SOLOT admitted that because he was only paid a small retainer payment to take the case, he would not actually defend father nor the apartments, and would do only what the judge ordered him to do, and he did not deem it necessary to refute accusations of the bank.

29.   When son protested that SOLOT had not ever sent father nor son a bill for more money, SOLOT admitted he did not do so because it would do no good since he knew they had no money until the apartments are returned by the bank.

30.   Additionally, son also asked SOLOT why he would not engage the bank personnel in depositions and discovery in order to authenticate records so that the records could be admitted to show debtor and son were never in default and prove the bank made a mistake, SOLOT said that since he is the attorney on the case and not son, and that he would only consider it.

31.   When son had previously asked SOLOT if he would ask the

bankruptcy court to divide or "bifurcate" the issues to make sure the judge did not rule on son's rights and on all state foreclosure claims, SOLOT also refused. When son then filed his own motion to divide and protect son's claims, the court refused on the grounds that son was not allowed to be a party in his father's bankruptcy and that SOLOT had to make the motion if the court was to consider it.

32.   When son filed his own a motion to the court for the power to compel deposition of the bank to prove debtor and son did nothing wrong, SOLOT refused to join son's motion and the judge refused to grant the motion because son was not allowed to be a party in his father's bankruptcy, and only defendant SOLOT's filings would be considered.

33.   When the bank then accused father and son of crimes to slander them in the court to ensure their success, SOLOT refused to oppose the labels.

34.   As father's attorney, SOLOT had a fiduciary duty to father and son and the trust, and that is the highest duty of care, and requires honesty, and requires action.

35.   As a part of his duty, SOLOT was required to tell father and son at the outset that SOLOT would not do what any lawyer should do in any bankruptcy to oppose actions of foreclosing banks and those seeking evictions.

36.   But SOLOT was not honest because his only goal was to collect the

initial retainer fee from father and son, and then do nothing, and file no

bankruptcy plan, and engage no one in any depositions or other discovery, and let

his clients lose quickly, so that SOLOT can get on with collecting money from

the next ignorant clients.   His only goal, therefore, was to induce reliance by lies.

37.   Therefore, on February 5, 2002 at 3:20pm, at the offices of TILTON

and SOLOT in Tucson, Arizona, SOLOT boldly misrepresented to father and son

that he would fully and properly represent father and fight for their property in

the family trusts in the bankruptcy, and challenge the bank's foreclosure of

January 25, 2002, which was the point of this 3rd bankruptcy action, because

SOLOT really had no intention of doing any of that.

38.   In fact, SOLOT's only goal was to collect an initial retainer and stop.

39.   Father and son, however, had no idea that was SOLOT's real

intention, and that he would "sell them down the river" just to get an initial

retainer amount, and would not have retained them had SOLOT told the truth.

40.   Father and son fairly relied on the presumption that their lawyer

would be honest with them since that is what the law requires of attorneys.

41.   That fraud was, therefore, an actual and proximate and legal cause of

father and son's losses and injuries, in the following ways:

a.   Father lost the entire $400,000 apartments.

b.   Son lost his $300,000 trustee's lien on them.

c.  Father and son and family trust lost the family home in California worth $1 million because of inability to pay the mortgage which the apartments paid for, and because of SOLOT's refusal to oppose the waiver of California Attorney Richter of mother's rights.

d.  Father and son and family trust lost the projects and properties in Pennsylvania and New York worth another $100,000.

e.  Son lost his active duty military career and his civilian career and a normal social life for two decades valued at $1 million, by having to concentrate all of his efforts on the bankruptcies to recover the property and generate the income for father's (and mother's) health care costs.

f.  The family medical research with alternative medicine was forced to stop  completely, putting father and mother at health risk immediately.

g.  Father died early as a result of the early eviction from the Arizona apartments, the stress of six mor years of daily litigation in several appeals and other courts, and lack of income to continue the medical treatments that prolonged father's life to 2002.

42.    WHEREFORE, son seeks and is entitled to $ 2.8 million from defendant in actual costs, and another $15 million in punitive damages.

# THIRD  CAUSE  OF  ACTION

# FOR  BREACH  OF  FIDUCIARY  DUTY

43.   All prior allegations are incorporated herein by this reference.

44.   After the failure of defendants to make the filings in 2002 which resulted in the losses as described above, TILTON  & SOLOT eventually refused to continue to appear in that bankruptcy court in 2003 and thereafter on behalf of father, or son, or trust, effectively "throwing up their hands" and giving up entirely, and took no steps at all to protect father or his property and did so without approval of the bankruptcy judge.

45.   The law requires the bankruptcy court to continue to protect a debtor and his property as long as the bankruptcy is open, under the rule in In re Sasson, 424 F.3d 864, 869 [6](9th Cir. 2005), and Catalano v. C.I.R., 279 F.3d 682, 685 [1] and 687 [10](9th Cir. 2002) (upon abandonment "the debtor's interest in the property is restored" but the stay is not lifted) and In re Chugach Forest Products, Inc., 23 F.3d 241, 246 [6](9th Cir. 1994) (stay protects the debtor, his property, *and* property of the estate).

46.   However, when local governments in New York and Pennsylvania made claims against two other family homes in trust, including one father was living in, these defendants refused to  write to those counties to tell them the law

still protects the properties, refused to even review the proceedings in the bankruptcy court that is only one mile from their office, forcing father to defend himself from Utica, New York 2,000 miles away after eviction from the apartments in Arizona, and also refused to file any actions in the bankruptcy court or anywhere else to stop evictions, and refused to either appear or argue against the decision of the bankruptcy court to abandon those houses from the bankruptcy without protection, resulting in the counties in NY and PA taking those properties.

47.    Moreover, when the bankruptcy court set a hearing to approve a bankruptcy plan and lift the bankruptcy protection of father and his property which would leave father and son's property for the NY and PA counties to take, SOLOT *also* failed to object to the plan, knowing father and son were denied the proceeds of sale of the San Diego house, denied the apartments, and denied any of the money that they came into the bankruptcy to protect, and that father did not even have money for necessary medical care nor to pay attorneys to protect those properties.

48.    This resulted in eviction actions against father, disconnection of electric power and heat to father's house in Utica NY in the winter, and threats of arrest of father which put father into intensive care in a NY hospital in 2005; yet still SOLOT still refused to take any step at all to help his client avoid any of it.

49.   Although this son is no bankruptcy expert, he did his best to try to prevent his father's death and the loss of the buildings by filing new law suits in state and federal courts in NY and PA, and appeals; which prevented son from working anywhere meaningfully in order to try to reverse the damage caused by the refusals of SOLOT.

50.   Son wrote to defendants and left messages, telling them his father's life is in danger and he needs a lawyer to appear and argue for him, and to keep the property which son owns from being taken, and they refused to respond at all.

51.   Son's father sent a letter asking the bankruptcy judge to get the lawyer to appear to make some argument, when father's safety was threatened in the house, and sent it to the defendants, and they still refused.

52.   The defendants had a duty to appear and argue on behalf of son's father so he had a place to live, and to argue for son's property that his father was living in, and for the PA house, because they had a fiduciary duty to son and his father as long as the bankruptcy is open.

53.   The defendants breached that duty, and did so over and over willfully and maliciously, for five years from 2003 to 2008, knowing the losses were taking place, that the threats of eviction and law suits and stress were killing father and they knew that they could have prevented the losses.

54.   Father and son were injured by the loss of the properties at 808

Oswego Street, Utica, NY and 828 S. Mill Street, New Castle, PA and by health

problems associated with the stress of defending the properties alone; and by the

loss of son's lien on those properties for his repair and management and court

appearances trying to avoid the takings and trying to prevent Utica City from

evicting father and son, and by the loss of employment son could have had for the

five years and a career he could have started, because of a near full-time devotion

to trying to reverse the damage these defendants created and protect his father.

55.   Son's mother and sisters were also injured by virtue of the their

inability to pay for their necessary medical care during that time which injuries

would not have happened had these defendants protected the trust property which

would have collected money in rents for treatments, and which would have

returned the proceeds of the San Diego house.

56.   These are issues which son may raise on their behalf because they

are beneficiaries of the same trust and son is a trustee of their trust and a loss to

his beneficiaries is a loss to son and entitles son to sue in his own name as trustee

for losses to his beneficiaries, under the rule in Taylor v. Sturgell, 07-371, U.S.

LEXIS 4885 at HN 4 (S.Ct. June 12, 2008) (under the doctrine of virtual

representation, the trustee actually represents the beneficiaries of his trust even if

they are not present), Citibank v. Miller & Schroeder Financial, Inc., 168 Ariz.

178, 183 [7], 812 P.2d 996 (Ariz. Ct. App. 1990)(trust imposes "an affirmative

duty" on the trustee of a trust to take the positions of his beneficiaries and recover their losses in court) and   In re Baletti, No. S-06-1507, 2006 U.S. Dist. LEXIS 78521 (E.D. Cal. Oct. 26, 2006)(legal owner is real party in interest).

57.   But for the willful refusals of these defendants these losses would not have occurred, and are the actual and proximate cause of the damages described.

58.   WHEREFORE, plaintiff is entitled to and seeks from this court $ 2.8 million from defendants in actual costs, and another $15 million in punitive damages, for the value of the houses in PA and NY, the value of son's hourly trustee's lien, the value of a career son could have had, and the other consequences of that loss.

# FOURTH  CAUSE  OF  ACTION

# FOR  WRONGFUL  DEATH

59.   All prior allegations are incorporated herein by this reference.

60.   In Arizona a death is wrongful when it is caused by any wrongful or negligent act of anyone, not just by a doctor, when it would otherwise not have happened at the time or in the manner it did, according to Arizona Revised Statutes, Section 12-611.

61.   The wrongful or negligent act can include simply denial of medication that could have extended the patient's life under the rule in <u>Ashcraft v. King</u>, 228 Cal.App.3d 604, 605, 278 Cal.Rptr. 900 (1991)(withdrawal of medical care that debilitates a patient can constitute battery).

62.   SOLOT's negligence and deliberate fraud resulted in the loss of the apartments and, therefore, the loss of income needed by father to continue alternative medical cures.

63.   With that alternative care father would have lived longer.

64.   Therefore, father's death was caused in whole or in part, by the conduct of these defendants.

65.   Additionally, the negligence and fraud of SOLOT in 2002 also caused a continuing stress from litigation, multiple evictions including threats of arrest and death during an eviction, and destruction of the entire family estate in 2002, 2003, 2004, 2005,  2006, 2007 and 2008, that finally drove  father to his grave trying to recoup the dream, and the life SOLOT destroyed.

66.   Therefore, but for the wrongful acts of SOLOT described above, father could or would have lived longer so the fraud and negligence of SOLOT was an  actual or proximate cause of the father's death.

67.   Under the law, it is not necessary for one cause to be the only reason for injury, to find "actual and proximate or legal cause of the injury or death".

68.   Instead, it is possible for several causes to contribute to an injury or death, including old age, and the stress of the extra litigation, and a jury may still find that one of those causes was a "substantial" factors and was an "actual or proximate or legal cause of injury or death", under the rule in Milliken v. Bradley, 418 U.S. 717, 745, 94 Supreme Court 3112, 41 L. Ed. 2d 1069 (1974)(there could have been several reasons for the loss claimed here, and several people may have each contributed substantially to cause the harm and, therefore, all of them could be a legal or proximate or substantial cause of the loss if this jury says so), and Scirex Corp. v. Federal Ins. Co., 313 F.3d 841, 849-50 (United States Court of Appeals for the 3d Circuit 2002)(the direct cause of a loss "does not have to be the sole cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be a proximate or substantial cause" of the loss to allow a damages award).

68.   Because father had a history of success with alternative medicine and actually reversed the effects of stroke through such regular treatments, and because his condition deteriorated rapidly when he lost the extra income from the apartments for those treatments in 2002, these acts by SOLOT to deny that money and that necessary medicine and replace it with a daily diet of litigation stress were an actual and proximate or legal causes of a death than would otherwise have occurred later.

69.   The time within which to sue for wrongful death in Arizona is three years, according to James v. Phoenix Gen. Hosp., 154 Ariz. 594, 744 P.2d 695, 698 (1987).

70.   Because of the bankruptcy freeze and the prior appeals above, only 10 months of the time within which to file this action actually ran, from  January 2010 when the bankruptcy appeals ended to October 2010 when son submitted his new action in Arizona state court.    (Son actually submitted first in 2009, but the clerk of the Arizona court refused to acknowledge receipt of it.)

71.   The denial of that fee waiver in the state court and the appeal from the denial also extended or suspended the deadline to sue until the denial of review by the Arizona Supreme Court in July 2013.  Therefore, this action is timely because it is filed after only 10 months of a three year deadline.

72.    A proof of damages is not a requirement for an Arizona wrongful death claim, and a jury may award whatever it wishes to compensate for any loss that is fair and just whether or not related to the wrongful conduct and whether or not the loss was foreseeable to the defendant, according to the Arizona Supreme Court in Walsh v. Advanced Cardiac Specialists Chtd., 229 Ariz. 193, 197, 273 P.3d 645, 649 (2012).

73.   Therefore, son asks the jury for damages for three types of injury.

74.   The first type of injury is the loss to the family real estate business by the loss of father's companionship to his son and management of the family trust. Father is the master carpenter, an immigrant with nothing when he arrived who created a small empire worth over a million dollars because of a special expertise in real estate and was the Leader of the Band for his son, who was able to buy and  build for the family trusts under father's direction but not without it.   Son's real  estate efforts were stopped and paralyzed for a decade, trying to litigate to get back  the apartments and the income father needed for treatments to stay alive, and son  has been adrift for years since father was taken because the guidance is gone, and  son  has never been able to generate the yearly income for the family trust that father  could manage with rental properties because the rental properties are gone because SOLOT lost them all.  Therefore, son seeks $100,000 a year for each year since the   paralysis of the litigation in 2001, until father's death in 2008 and another $100,000 a year until this trial, for that missing expertise to the family trust, or $1.4 million.

75.   The second type of injury is that the death prevents father from exercising his right to testify now about conversations with SOLOT, and from testifying in other family litigation to recover other property for the family trusts. As to this son asks the jury to treat son's allegations here as if father would have verified and supported them but for SOLOT' acts that ended that father's life and

the ability to appear and testify in person, in this court now.

76.   The jury is urged to consider that interfering with a client's right to sue his lawyer by the lawyer destroying evidence is a separate claim that allows a jury to assume the evidence would have been in favor of the client, under the rule in    Hazen v. Municipality of Anchorage,  718 P. 2d 456, 463 (Alaska 1986) (intentional interference with prospective legal action by spoliation of evidence is an actionable tort).

77.   Therefore, son asks the jury to decide if it is fair and right to consider SOLOT' actions which killed father early as a form of interfering with the ability of the witness to testify with his son.

78.   The third type of injury is the loss of family medical experiments and son's chances for admission to a reputable graduate medical school for a career as a physician assistant because father had a history of reversing or "scaling-back" the symptoms of arterial occlusion with son's alternative medical treatments, which son because of son's age had to finish and publish to have any realistic chance of admission to the medical school and career.

79.   Because SOLOT caused the loss of that chance at son's realistic admission to a graduate medical program, this jury may find SOLOT liable for the loss of that career of son, under the rule in Greenberg  v. Hollywood Turf Club, 7 Cal.App.3d 968, 86 Cal.Rptr. 885, 890-91 [11] (1970) (plaintiff may sue for

interference with trade or calling even though he had no job and no actual employment relationship and no license, because he was stopped before he could get access to any job); <u>Gold v. Los Angeles Democratic League</u>, 49 Cal.App.3d 372, 375 [13], 122 Cal. Rptr. 732, 739 (1975)(good claim for loss of career even though plaintiff had no track record in that office, and no existing contracts and merely took steps to run and was then stopped).

80. The value of that career is at least $2 million, and son asks for that award against TILTON and SOLOT and against their firm TILTON & SOLOT.

81. WHEREFORE, plaintiff is entitled to and prays for relief from this court from defendant for $3.4 million in damages for wrongful death alone.

82. Plaintiff now verifies the allegations of fact made herein.

83. A jury is requested.


DATED: August 20, 2013